UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

JAZMINE HEADLEY, on her own behalf and
on behalf of her minor son D.B.,

                      Plaintiff,

        -against-

THE CITY OF NEW YORK; HUMAN
RESOURCES AUTHORITY ("HRA") PEACE
OFFICER BETTINA BARNETT-WEEKES;
HRA SERGEANT TOYIN RAMOS-
WILLIAMS; HRA PEACE OFFICER
MAYRA RIVERA; HRA PEACE OFFICERS
RICHARD AND RAE ROE #1-3; JUANITA
ALSTON; NEW YORK CITY POLICE
DEPARTMENT ("NYPD") OFFICER
SHAWNDEL LATHAM (Shield No. 19513);
NYPD OFFICER JOHN DOE (Shield No.
7169); and NYPD OFFICERS JANE DOE
AND JOHN ROES #1-3, in their individual
capacities,

                      Defendants.

No. 19 Civ. 4543

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

       Plaintiff Jazmine Headley, on her own behalf and on behalf of her minor son

D.B., by and through her attorneys, Emery Celli Brinckerhoff & Abady LLP, for her Complaint

alleges as follows:

## PRELIMINARY STATEMENT

       1.      On Friday, December 7, 2018, Jazmine Headley went to the DeKalb Job

Center, a Brooklyn office of the New York City Human Resources Administration ("HRA"),

looking for help.  A 23-year-old single, working mother, Ms. Headley had taken off work from

her cleaning job to find out why HRA had cut off her child care benefit.  Because her 1-year old

son D.B. could no longer attend daycare, Ms. Headley brought him along to the office.  She

packed a bag for what she knew would be a long day: bottles, diapers, toys, wipes—all the

supplies she needed to wait hours in a cramped office with a toddler.  Ms. Headley arrived at the

DeKalb Job Center at 9:50 a.m., determined to get to the bottom of the problem so D.B. could

return to daycare and she could return to work.

   2. By the end of the day, Ms. Headley had been humiliated, assaulted,

physically injured, threatened with a taser, brutally separated from her son, handcuffed, arrested,

and jailed—all by employees of the City of New York.  Her son D.B.—who was still

breastfeeding—had been brutally wrenched from his mother's arms, taken by strangers to a

police precinct, and released to spend the night without his mother for the first time in his life.

   3. What unleashed this torrent of violence and abuse against a young mother

and her son?  Ms. Headley had dared to sit on the floor of the crowded HRA waiting room next

to her son's stroller, her back against a wall.  She was tired after waiting for almost three hours to

see a caseworker.  In a grossly disproportionate response, HRA peace officers had demanded that

Ms. Headley leave the HRA office.  When Ms. Headley politely asked to see a supervisor, the

HRA peace officers reacted with fury.  As Ms. Headley walked away, HRA and NYPD officers

grabbed her, yanked at D.B.'s limbs, brandished a taser inches from their faces, and took D.B.

away from her in a chaotic and terrifying public display of excessive force.  In the background,

onlookers screamed, and recorded the events on their cellphones.  The NYPD officers then

arrested Ms. Headley on a slew of frivolous criminal charges, all of which were later dismissed.

During and after these events, Ms. Headley experienced intense fear, shock, humiliation, and

terror.  She is too afraid to return to *any* HRA office for further assistance with her benefits.

   4. Captured on cellphone video by horrified onlookers, Ms. Headley's and

her son's treatment at the HRA office that day (the "Incident") commanded the attention not only

of New Yorkers, but of people around the world.  That these events stemmed from Ms.

Headley's simple desire to sit on the floor next to her son after waiting for hours to solve a

bureaucratic error only furthered widespread public outrage.  Seeking help so she could go to

work and provide for her family, Ms. Headley was instead attacked.  Only after Ms. Headley's

arrest, detention, and forcible separation from her son was her child care benefit reinstated.

5.      Defendants' actions demonstrate a reckless and callous indifference to Ms.

Headley's and D.B.'s rights.  All their pain, humiliation, and trauma could so easily have been

avoided if any City employee had paused, found Ms. Headley a place to sit, and checked when

her number would be called.  Instead of assisting Ms. Headley after her three-hour wait with a

toddler, or taking any actions to de-escalate the situation, the responding officers attacked her,

ripped her son from her arms, threw her in jail with a restraining order against her own child,

and, in the process, upended her life.

6.      Such mistreatment and abuse of HRA clients at New York City HRA

offices is not a new problem.  The City of New York has permitted HRA peace officers to treat

HRA clients with violence and contempt for far too long.  And NYPD officers continue to arrest

parents in front of their children in ways that are needlessly traumatic.  Such longstanding,

widely-known problems came together on December 7, 2018 to cause Ms. Headley and D.B.

grave and lasting harm.  Plaintiff brings this action to address these egregious violations of Ms.

Headley's and her son D.B.'s rights.

**PARTIES**

7.      Plaintiff Jazmine Headley is a 24-year-old African-American woman who

at all relevant times was a resident of New York.  Ms. Headley is a native New Yorker who was

3

born and raised in Brooklyn, New York.  Ms. Headley attended the Gramercy Art High School in Manhattan.  After graduating in 2013, Ms. Headley interned at LaGuardia College, and attended a semester of Berkley College.  She has held many jobs to support herself and her son, including working with people with developmental disabilities, in the service industry, and in retail.  At the time of the Incident, Ms. Headley worked cleaning offices for a local small business, a job for which she obtained OSHA certification.

8.     D.B. is a two-year-old African-American boy, and Ms. Headley's only child, who at all relevant times was a resident of New York.  At the time of the Incident, D.B. was one year old.

9.     Defendant City of New York (the "City") is a municipal corporation duly organized under the laws of the State of New York.  At all times relevant hereto, the City, acting through HRA and the NYPD, was responsible for the policy, practice, supervision, implementation, and conduct of all HRA and NYPD matters, including the appointment, training, supervision, and conduct of all HRA and NYPD personnel.  In addition, at all relevant times, the City was responsible for enforcing the rules of HRA and of the NYPD and for ensuring that HRA and NYPD personnel obey the laws of the United States and of the State of New York.

10.    At all relevant times, Defendant Bettina Barnett-Weekes was a peace officer of the New York City Human Resources Administration, acting in the capacity of agent, servant, and employee of the City, and within the scope of her employment as such.

11.    At all relevant times, Defendant Mayra Rivera was a peace officer of the New York City Human Resources Administration, acting in the capacity of agent, servant, and employee of the City, and within the scope of her employment as such.

12.     At all relevant times, Defendant Toyin Ramos-Williams was a peace officer of the New York City Human Resources Administration, acting in the capacity of agent, servant, and employee of the City, and within the scope of her employment as such.

13.     Defendants Richard and Rae Roe # 1-3, names unknown, were each at all times relevant peace officers for HRA, acting in the capacity of agents, servants, and employees of the City, and within the scope of their employment as such.  Defendants Richard and Rae Roe # 1-3 are being sued under a fictitious first name because their names are unknown at this time.

14.     At all relevant times, Defendant Juanita Alston was an employee of HRA working at the DeKalb Job Center, acting in the capacity of agent, servant, and employee of the City, and within the scope of her employment as such.

15.     At all relevant times, Defendant Shawndel Latham, Shield No. 19513, was a police officer of the New York City Police Department, acting in the capacity of agent, servant, and employee of the City, and within the scope of her employment as such.

16.     At all relevant times, Defendant John Doe, Shield No. 7169, was a police officer of the New York City Police Department, acting in the capacity of agent, servant, and employee of the City, and within the scope of his employment as such. Defendant Doe is being sued under a fictitious name because his name is unknown at this time.

17.     Defendants Jane Doe and John Roes #1-3, names and shield numbers unknown, were each at all times relevant officers of the NYPD, acting in the capacity of agents, servants, and employees of the City, and within the scope of their employment as such. Defendants Jane Doe and John Roes #1-3 are being sued under fictitious names because their names are unknown at this time.

18.     Defendants HRA Peace Officers Bettina Barnett-Weekes, Toyin Ramos-

Williams, Mayra Rivera, Richard and Rae Roe #1-3, and NYPD Police Officers Shawndel

Latham, John Doe, and Jane Doe and John Roes #1-3 are collectively referred to as the

"Individual Defendants."

19.     Defendants HRA Peace Officers Bettina Barnett-Weekes, Toyin Ramos-

Williams, Mayra Rivera, Juanita Alston, and Richard and Rae Roe # 1-3 are collectively referred

to as the "HRA Defendants."

20.     Defendants NYPD Police Officers Shawndel Latham, John Doe, and Jane

Doe and John Roes #1-3 are collectively referred to as the "NYPD Defendants."

## JURISDICTION AND VENUE

21.     This action arises under the Fourth and Fourteenth Amendments to the

United States Constitution, 42 U.S.C. §§ 1983 and 1988, and New York State law.

22.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3),

1343(a)(4), and 1367.

23.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because the acts

complained of occurred in the Eastern District of New York.

## JURY DEMAND

24.     Plaintiff demands trial by jury.

## FACTUAL ALLEGATIONS

I.     **The Events of December 7, 2018**

    **A.  Ms. Headley Learns that Her Child-care Benefit Was Terminated**

25.     On Thursday, December 6, 2018, D.B.'s child-care provider informed Ms.

Headley that D.B. could no longer attend his regular daycare in Brooklyn because HRA had

terminated her child-care benefit.

26.     Ms. Headley was surprised, as she never received notice of the termination.

27.     Ms. Headley needed this benefit—if D.B. could not participate in child-care, she could not work to support him.  Concerned, Ms. Headley requested to take the next day off from work to visit the HRA center and resolve the situation.  Her employer was unhappy about her absence.

**B.  Ms. Headley Arrives at the DeKalb Job Center and Waits Over Three Hours**

28.     At around 9:50 a.m. on December 7, 2018, Ms. Headley arrived at the DeKalb Job Center, located at 275 Bergen Street in Boerum Hill, Brooklyn.

29.     With D.B. in his stroller, Ms. Headley obtained her ticket and proceeded to wait to see the caseworker for information on her terminated child-care benefit.

30.     Ms. Headley asked if D.B. could play in the child-care area available at the office, but HRA workers refused because he was not fully potty-trained.

31.     Ms. Headley's number was finally called hours later.  She met with an HRA representative who told her that there were no active benefits in her case.

32.     The HRA representative stated that she could not help Ms. Headley with re-enrollment, and directed Ms. Headley to get a new number and wait to be called a second time to see a different caseworker.

33.     Following these instructions, Ms. Headley then went with D.B. to the "blue area" waiting room.

34.     When she arrived, the area was crowded and she did not see any available seats.  After standing for several minutes, Ms. Headley found a spot against a wall.  She observed bins for recycling and trash along the wall.

7

35.     With D.B.'s stroller directly against the wall, pointed sideways, Ms. Headley sat down on the floor with her back against the wall.

**C.  HRA Officers Confront Ms. Headley Because She is Sitting on the Floor**

36.     After a few minutes, an HRA security guard approached Ms. Headley, and stated, in sum and substance: "You have to get up, you cannot sit here."

37.     Two HRA peace officers, Defendants Rivera and Ramos-Williams, approached Ms. Headley and told her in an aggressive manner that she could not sit on the floor.

38.     Ms. Headley responded in a calm voice that she had a number and that she was simply waiting to be called.

39.     Defendant Barnett-Weekes joined the group, and began clapping her hands close to Ms. Headley's face.

40.     Defendant Barnett-Weekes addressed Ms. Headley as "girl," and said: "You need to get up . . . you hear her telling you to get up, you need to get up."

41.     Ms. Headley told Defendants Barnett-Weekes, Rivera, and Ramos-Williams that she was sitting to wait for her number to be called.

42.     The three HRA peace officers eventually left the area.  Ms. Headley remained with D.B., still waiting for her number to be called.

**D.  HRA Officers Summon the NYPD to the Scene, Escalating the Situation**

43.     Upon information and belief, Defendant Ramos-Williams called the NYPD to the scene.

44.     Several minutes later, at approximately 1:00 p.m., the three HRA officers returned with two NYPD officers, Defendant Officers Latham and Doe.

45.     Upon information and belief, there was no protocol, plan, or even

understanding regarding which agency, HRA or NYPD, was managing the interaction or in control of the scene.

46.     Defendants Barnett-Weekes, Rivera, and Ramos-Williams, and Defendant Officers Latham and Doe, approached Ms. Headley where she sat with D.B.

47.     Before Ms. Headley could speak, Defendant Barnett-Weekes interjected, in sum and substance, "This woman is trespassing, and she needs to be removed and she's belligerent."  Prior to this point, no one had accused Ms. Headley of trespassing.

48.     While seated and looking up at the officers, Ms. Headley replied in a calm manner that she had a ticket and was just waiting to be called to see the caseworker.

49.     Defendant Officers Latham and Doe said, in sum and substance, "If you're asked to leave, you have to leave."

50.     Still unclear as to how she was trespassing or why she was being asked to leave, Ms. Headley politely asked to speak to a supervisor.

51.     Defendant Barnett-Weekes told her in sum and substance that she could not speak to a supervisor and she had to leave.

52.     Still in the stroller and tuned into the angry tone of the officers, D.B. began reaching for his mother, which prompted Ms. Headley to pick him up.

53.     Ms. Headley again calmly asked to speak to a supervisor about why she was being forced to leave.  After waiting so long to see the caseworker, she could no bear to have wasted the day.

54.     At this point, Defendant Barnett-Weekes began touching Ms. Headley's belongings and pushed the stroller into Ms. Headley's side.

55.     Surrounded by officers who were making physical contact with her stroller

and encircling her, Ms. Headley felt afraid, but tried to remain calm for D.B.'s sake.

56.     Defendant Barnett-Weekes then stated, in sum and substance: "If you don't go, you're going to arrested.  And if you get arrested, your kid goes to ACS."

57.     Ms. Headley stood up and took two or three steps away from the officers while pushing her stroller and carrying D.B. in her arms.

58.     Defendant Barnett-Weekes made a swift and aggressive grab on Ms. Headley's right shoulder and shouted: "Grab the baby, grab her!"

59.     As Defendant Barnett-Weekes held on to her right shoulder, grabbing it, Ms. Headley went down to the floor.

60.     Ms. Headley then said she wanted to leave, but Defendant Officers Latham and Doe told her that it was "past that."

**E.  Defendant Officers Attack Ms. Headley and Forcibly Yank D.B. from Her Arms**

61.     After she was taken to the floor, Ms. Headley's back was on the ground.

62.     Ms. Headley held D.B. closer to her chest to protect him.

63.     Defendants Barnett-Weekes, Rivera, and Ramos-Williams, and Defendant Officers Latham and Doe surrounded Ms. Headley.

64.     During the ensuing assault on Ms. Headley, Defendants Richard and Rae Roe #1-3 joined the scene.

65.     Defendants Barnett-Weekes, Rivera, Ramos-Williams, and Richard and Rae Roe #1-3, along with Defendant Officers Latham and Doe, pulled and yanked Ms. Headley's and D.B's body and limbs, trying to violently wrestle D.B. from Ms. Headley's arms, or stood by and failed to intervene while their fellow officers did so.

66.     Ms. Headley repeatedly cried: "Don't hurt my baby, you're hurting my

10

baby."

67.     Defendant NYPD Officer Doe pinned Ms. Headley's arm down with so much force that Ms. Headley experienced extreme pain.

68.     Terrified, Ms. Headley clutched D.B. to her chest and screamed for help, telling onlookers: "They're hurting my son!"  A crowd began to gather around the scene.

**F.  Defendants Brandish a Taser Inches from Ms. Headley's and D.B.'s Faces**

69.     Defendant Officer Latham pulled out a taser and pointed it at the crowd.

70.     Defendant Officer Latham pointed the taser directly at Ms. Headley and at D.B., inches from their faces.

71.     After brandishing the taser for several seconds, Defendant Officer Latham dropped it on the floor.

72.     At or around this time, Defendant Officers Jane Doe and John Roes #1-3 arrived at the scene and joined the other officers in violently attacking and separating Ms. Headley from her son.

73.     The large crowd of people shouted and pressed towards Ms. Headley, adding to the chaotic and dangerous situation with D.B. at its center.

74.     Still not understanding what officers wanted from her, Ms. Headley did not realize she was being arrested.

75.     Eventually, Defendants Barnett-Weekes, Rivera, Ramos-Williams, and Richard and Rae Roes #1-3, along with Defendant Officers Latham, Doe, Jane Doe, and John Roes #1-3, forcibly pulled D.B. away from Ms. Headley, or stood by and failed to intervene while their fellow officers did so.

76.     While she was pulled to her feet and handcuffed, Defendant Juanita Alston

took D.B. away from Ms. Headley, without Ms. Headley's consent or permission.

77.     Ms. Headley was overwhelmed with fear when she saw D.B. being carried away by a stranger; she was not in control of her son's well-being, and was helpless to protect him.

78.     After her son was wrenched from her arms, Ms. Headley pleaded that D.B. be returned to her.

79.     Because he was separated from her in a violent and abrupt manner, Ms. Headley never had an opportunity to explain to D.B. what was happening to him.

80.     Defendant Officer Doe cuffed Ms. Headley's hands behind her back so forcefully that her wrists were bruised and remain scarred today.

81.     As Defendants Officers Latham, Doe, Jane Doe, and John Roes #1-3 removed her from the HRA building, Ms. Headley repeatedly asked where her son was.  Outside, Ms. Headley continued to plead for her son to be brought back to her.

82.     After Defendants Latham and Doe placed her in the police car, Ms. Headley saw a stranger holding her son while standing in front of the building.

83.     D.B. wept while being taken away from his mother in a police car.

**G. The NYPD Arrests and Detains Ms. Headley**

84.     Defendant Officers Latham and Doe transported Ms. Headley to the 84th Precinct.

85.     For some time while she was taken to the 84th Precinct, Ms. Headley did not know where her child was.

86.     At the 84th Precinct, Ms. Headley was searched, fingerprinted, and photographed.

87.     Ms. Headley remained at the 84th Precinct for many hours.

88.     Defendants Jane Doe and John Roes #1-3 escorted D.B. to the 84th Precinct in a separate police vehicle, but they kept D.B. separated from Ms. Headley at all times.

89.     D.B. was forced to remain at the precinct with strangers until his grandmother arrived, frantic with concern after leaving her job as a security guard to rush to the police station.

90.     D.B. was unusually quiet and looked scared when his grandmother picked him up from the police station.

91.     Ms. Headley was eventually taken to Central Booking.

92.     She stayed at Central Booking overnight in filthy conditions.

93.     Defendant Latham swore to a criminal complaint falsely alleging that Ms. Headley had obstructed governmental administration, resisted arrest, endangered the welfare of a child, and trespassed.

94.     At approximately 6:00 p.m. on December 8, 2018, Ms. Headley was arraigned.

95.     The Court also issued a Temporary Order of Protection directing Ms. Headley to stay away from her son.

96.     As a result of these court proceedings, ACS was also notified of Ms. Headley's arrest, triggering an investigation into her family.

97.     Ms. Headley was sick with worry about D.B.'s welfare and well-being.

98.     During her arraignment, Ms. Headley was informed of an outstanding warrant related to a 2016 misdemeanor arrest in New Jersey.  Ms. Headley resolved this charge with a pre-trial intervention and completed all the corresponding community service hours.

13

**H.  Ms. Headley Spends Multiple Nights on Rikers Island Apart from Her Son**

99.     Ms. Headley was transported to Rikers Island via bus in the early morning hours of December 9, 2018.

100.     Completely alone on the bus with two male corrections officers, Ms. Headley was scared that she would again be assaulted.

101.     Ms. Headley had never been incarcerated before.  She was terrified to be in jail.  While at Rikers Island, she experienced anxiety and panic attacks.  Ms. Headley was unable to eat and lost weight.

102.     Ms. Headley was tormented that the "stay away" Order of Protection would prevent her from seeing D.B. even if she was released.  She had no idea if and when it would be lifted.

103.     Ms. Headley remained on Rikers Island until December 11, 2018, when she appeared for her next court date in Kings County Criminal Court.

104.     Ms. Headley was represented by Brooklyn Defender Services, which had been advocating for her release.

105.      The District Attorney dismissed all of the charges against Ms. Headley on December 11, 2018.

106.     The Temporary Order of Protection was dissolved.

107.     Justice Craig S. Walker, presiding over the conference, ordered that Ms. Headley be released, reportedly stating that the video of Ms. Headley's arrest was a "horrific scene that was broadcast all over the United States."[1]

---

[1] Michael Gold & Ashley Southall, *Charges Dropped Against Brooklyn Mother Who Had Baby Ripped from Her Arms by Police*, N.Y. Times (Dec. 11, 2018), *available online at* https://www.nytimes.com/2018/12/11/nyregion/jazmine-headley-baby-video-nypd.html.

108.    Ms. Headley was released from Rikers Island at approximately 9:00 p.m. on December 11, 2018.  She and her son were reunited that evening at home in Brooklyn.

109.    Ms. Headley has suffered and continues to suffer physical, mental, emotional, and psychological injuries as a result of Defendants' conduct.

110.    The continued separation from D.B. during Ms. Headley's detention caused her emotional injury.  It was the first time Ms. Headley had been away from D.B. for even one night.  Ms. Headley also was beginning to transition out of breastfeeding.  The separation disrupted that natural process.

111.    Ms. Headley has suffered from the intense invasion of her privacy as a result of Defendants' conduct.  While she was incarcerated, cell phone videos of the Incident taken by other HRA clients went viral.

112.    The Incident received international coverage in print and television media.

113.    The videos of the Incident have been viewed online more than a million times.

114.    Ms. Headley was besieged by media at her home for many days after the Incident.

115.    Ms. Headley's name and image will forever be associated with this traumatic and violent experience.  Her privacy and her son's privacy are permanently compromised.

116.    D.B. has suffered and/or continues to suffer physical, mental, emotional, and psychological injurie as a result of Defendants' conduct.  He displayed changed behaviors after the events, including a diminished appetite, separation anxiety, and difficulty sleeping, and he became more withdrawn.

15

117.    D.B. endured a formative incident of trauma.  He will forever confront increased long-term health and life consequences as a result.

118.    Plaintiff served notices of claim on the City of New York on December 13, 2018.  Ms. Headley submitted to examination on January 10, 2019, as required by General Municipal Law § 50-h.

119.    At least thirty days have elapsed since the service of the notices of claim, and adjustment or payment of the claims has been neglected or refused.

120.    This action has been commenced within one year and ninety days after the happening of the event upon which the claims are based.

## II.    New York City Public Officials Condemn Defendants' Treatment of Ms. Headley

121.    In the days following the Incident, many New York City public officials condemned the treatment of Ms. Headley.

122.    Mayor DeBlasio stated:  "It's unbelievable to me that people who have the title of peace officer would do this to a woman and her baby.  She posed no threat whatsoever.  I watched the video . . . there was no call for that type of response."[2]

123.    City Council Speaker Corey Johnson stated: "The level of trauma inflicted here on this young mother and child is deeply upsetting, disturbing and unacceptable.  I don't know what justification can be given for that video where you see the officer multiple times trying to rip the baby away from Jazmine Headley, a 1-year-old child, a taser that is close to her head."

124.    HRA Commissioner Steven Banks variously described Ms. Headley's

---

[2] Yoav Conen, *De Blasio Says It's 'Unbelievable' Officers Ripped Baby from Mother's Arms*, N.Y. Post (Dec. 12, 2018), https://nypost.com/2018/12/12/de-blasio-says-its-unbelievable-officers-ripped-baby-from-mothers-arms/.

experience as "intolerable," "unacceptable," and a "horrible incident," and stated: "I would certainly say to her as a parent I apologize that you went through this horrible situation in one of our offices.  I think the situation for this young mother could have been deescalated.  There could have been interventions that didn't allow it to get to this point."[3]

125.    Commissioner Banks later went on to say that: "Notwithstanding the significant efforts we have implemented over the past five years . . . on any given day a client may experience challenges at any one of our offices that do not reflect the major policy changes we had made, our values or the dedication of the vast majority of our staff."[4]

126.    Brooklyn District Attorney Eric Gonzalez stated that he was "horrified by the violence depicted in the video and immediately opened an investigation" into the arrest.  He said a review of the case showed that it was not handled properly.[5]  "The consequences this young and desperate mother has already suffered as a result of this arrest far outweigh any conduct that may have led to it," he said.  "She and her baby have been traumatized."

**A.  The NYPD Blames the HRA Defendants for the Incident**

127.    The NYPD Internal Affairs Bureau conducted a preliminary review of the Incident and concluded that: "[t]his incident was chaotic and difficult to watch, and clearly something went wrong."

128.    IAB found: "The preliminary review finds that the incident was escalated by HRA personnel, and would likely have been avoided without that escalation."

---

[3] *New York City Council General Welfare Committee Oversight Hearing: The Client Experience at HRA Centers*, (February 4, 2018) (testimony of Commissioner Steven Banks).

[4] *Id.*

[5] Michael Gold & Ashley Southall, *Charges Dropped Against Brooklyn Mother Who Had Baby Ripped from Her Arms by Police*, N.Y. Times (Dec. 11, 2018), *available online at* https://www.nytimes.com/2018/12/11/nyregion/jazmine-headley-baby-video-nypd.html.

129. Upon information and belief, Defendants Barnett-Weekes and Ramos-Williams were suspended without pay soon after the Incident.

130. Upon information and belief, Defendant Barnett-Weekes resigned in early February 2019.

131. Upon information and belief, Defendant Ramos-Williams is currently on modified duty as OATH proceedings are pending against her.

III. **The City's Policies Permitting the Abuse of HRA Clients, Its Failure to Train HRA Security Staff, and Its Failure to Train NYPD Officers Regarding Child-Sensitive Arrest Policies Caused Ms. Headley's and D.B.'s Injuries and Trauma**

A. **The City Has Known for Years that HRA Security Staff Routinely Mistreat HRA Clients**

132. Ms. Headley is not the first victim of HRA security staff's violence, overreach, and abusive tactics.

133. The City has long known that HRA security staff frequently mistreat HRA clients at HRA offices. HRA staff instigate physical violence. They foster an environment of fear. And they are quick to summon the NYPD to make arrests, even absent probable cause or where HRA staff themselves initiated the conflict.

134. The City has permitted, tolerated, and sanctioned HRA security staff's pattern and practice of abuse, which is endemic to HRA offices in every borough.

135. Advocates and the press have publicized this ongoing issue. Numerous HRA clients have filed notices of claim and sued the City and the HRA.

136. Despite this ample notice, the City continues to turn a blind eye to HRA security staff's violence towards HRA clients like Ms. Headley, who are discouraged from

accessing assistance that many of them need to survive.[6]

      **a.   Advocates and the Press Highlight HRA Security's Routine Misconduct**

     137.    Since at least 2009, newspapers have published accounts about the abuse of HRA clients, and advocacy groups have investigated various incidents.

     138.    A 2014 report by the Urban Justice Center's Safety Net Project highlighted HRA peace officers' harsh treatment of HRA clients.  The report concluded that "A vast majority of respondents reported that . . . hostile security personnel often escalate problems and make [clients] feel unsafe rather than secure."[7]

     139.    A 2019 report by the same organization found that the mistreatment of HRA clients by staff remains a profound area of concern for recipients of benefits.[8]

     140.    In testimony before the New York City Council from the Urban Justice Center's Safety Net Project, advocates noted: "While Ms. Headley's story has garnered a huge amount of media and political attention, we know from our daily work that hostile and traumatizing experiences play out every day at HRA centers."[9]

     141.    A 2017 ABC 7 News Investigation found that HRA peace officers issued 576 criminal summonses to HRA clients—seventy-seven percent of which were dismissed.[10]

---

[6] Helen Strom & Afua Atta-Mensah, Urban Justice Center, *Culture of Deterrence: Voices of NYC Public Assistance Recipients* 8 (May 2014), *available online at* https://snp.urbanjustice.org/sites/default/files/snp.web.doc_report_culture-of-deterrence_20140611.pdf.pdf.

[7] *Id.* at 7.

[8] Kiana Davis, et al., Helen Strom, Craig Hughes, and Zak Aldridge, Safety Net Project and Safety Net Activists at the Urban Justice Center, *The Bureaucracy of Benefits: Struggling to Access Public Assistance and SNAP in New York City* (January 2019), *available online at* https://snp.urbanjustice.org/sites/default/files/Bureaucracy-of-Benefits-color.pdf.

[9] *New York City Council General Welfare Committee Oversight Hearing: The Client Experience at HRA Centers*, (February 4, 2018) (testimony of the Safety Net Project at the Urban Justice Center).

[10] Eyewitness News ABC 7, *Majority of HRA Police Summonses Tossed Out*, Nov. 7, 2018, https://abc7ny.com/exclusive-most-hra-police-summonses-tossed-out-by-courts/4639417/.

Only thirty-four percent of other criminal summonses are dismissed in New York City courts.[11]

142.    It is plain that HRA staff are issuing summonses—which are dismissed at a disproportionately higher rate than others—for the sole purpose of harassing clients.

143.    In addition to other information, these reports and investigations alerted the City to the punitive and illegal practices occurring at HRA offices.

**b.  The City and HRA Are Repeatedly Sued By HRA Clients**

144.    The City also knows about HRA security staff's abuse because it has been sued over and over by HRA clients victimized at HRA offices.

145.    In 2009, Victoria Robinson sued the City and an HRA peace officer after her false arrest and detention in a Bronx HRA office.  After waiting for more than two hours in for assistance with child-care forms, Ms. Robinson was forcibly grabbed, handcuffed, and detained by a peace officer, then given a summons for disorderly conduct that was subsequently dismissed.[12]

146.    In 2011, William Broady sued the City after an HRA peace officer grabbed his collar, dragged him to a hallway, and placed him in a chokehold—all because he had waited for hours to apply for Medicaid.  Mr. Broady required five staples to close the resulting head wound, and sustained a broken nose, black eye, and damaged blood vessels in both eyes.[13]

147.    The same HRA peace officer who choked Mr. Broady also beat

---

[11] Kerry Mulligan, Ph.D., Adam G. Fera, M. Phil, et al., The Criminal Justice Reform Act Evaluation: Trends in Criminal Summonses Pre-Implementation, 2003-2016. New York: New York, 57, Feb. 2018, *available online at* https://datacollaborativeforjustice.org/wp-content/uploads/2018/02/2018.02.28.CJRA_.Baseline.ReportFINAL-1.pdf.

[12] *See Robinson v. City of New York, et al.*, Index No. 0303343/2009 (Sup. Ct. Bronx Cnty).

[13] Alison Gendar, *Peace cop being probed for beatdowns; three say he roughed them up at city welfare office*, N.Y. Daily News, (Oct. 17, 2010), http://www.nydailynews.com/new-york/peace-probed-beatdowns-roughed-city-welfare-office-article-1.192960.

Christopher and Ebony Owens.  After an exchange about whether Ms. Owens could receive help, the officer directed a subordinate to grab Ms. Owens and drop her to the floor, then handcuff both Owenses and issue them summonses for harassment.  Ms. Owens, who was fourteen weeks pregnant at the time, reportedly miscarried because of this violence.[14]

148.    In 2015, Taina Clarke sued the City and HRA for yet another beating. After Ms. Clarke waited for hours for assistance at a Queens HRA office, two peace officers threatened her with arrest for trespass.  Unprovoked, they grabbed Ms. Clarke, arrested her, and slammed her into a hallway, closet, and elevator.  Ms. Clarke received emergency treatment for injuries to her wrists, shoulder, and elbow.[15]

149.    In 2015, Anthon Birch sued the City following his arrest at a Bronx HRA office.  When Mr. Birch arrived at the office, a peace officer told him the officer was closed; Mr. Birch requested an opportunity to speak with a supervisor.  Unprovoked, another peace officer struck and arrested him.[16]

150.    In 2016, Odildzhobn Odilov sued the City for similar abuse.  Mr. Odilov was assaulted and arrested by an HRA peace officer and taken to receive emergency medical treatment.  Afterward, he realized his wallet was at the HRA office where the assault occurred. When he returned there at the instruction of HRA staff, peace officers dragged him into the building, handcuffed him, and summoned an ambulance to transport Odilov for psychological evaluation as an emotionally disturbed person.  The hospital immediately released Odilov.[17]

---

[14] *Id.*

[15] *See Clarke v. City of New York, et al.*, No. 17 Civ. 746 (E.D.N.Y.).

[16] *See Birch v. City of New York, et al.*, No. 15 Civ. 5993 (S.D.N.Y.).

[17] *See Odilov v. City of New York et al.*, Index No. 702272/2018 (Sup. Ct. Queens Cnty.).

21

151.    In 2017, Laura Zilioli sued the City and the HRA after she was arrested and sexually assaulted by an HRA peace officer.  When Ms. Zilioli became upset that her check was not ready for pick-up, HRA peace officer John Lugo arrested her, handcuffed her in a private HRA office room, and sexually assaulted her.[18]  Lugo received a five-year sentence after pleading guilty to the violent sexual assault of Ms. Zilioli.[19]

152.    In 2018, Victor Rivera sued the City after an HRA peace officer arrested Mr. Rivera for disorderly conduct, then beat him unconscious in an elevator before charging him with disorderly conduct and harassment.  All charges against Mr. Rivera were dismissed.[20]

153.    Just this March, Miguel Mendez sued the City and HRA peace officers for yet more violence.  After discussing an issue with his benefits application, Mr. Mendez was asked to leave the HRA office; HRA peace officers pinned Mr. Mendez against the wall, pressed a baton to his neck, struck his legs, and called him abusive names.  After a thirty-nine-hour detention, all charges against Mr. Mendez were dismissed.[21]

154.    As HRA client Brenda Riley stated at a City Council hearing in February 2019 about client experiences at HRA offices: "they call the cops for everything, even if you're smoking outside."[22]  A longtime resident of the City, Ms. Riley said that such treatment is

---

[18] Ciara McCarthy & Patch Staff, *Woman Sues NYC Saying Peace Officer Sexually Assaulted Her*, Patch (Dec. 6, 2017), https://patch.com/new-york/west-village/woman-sues-city-saying-peace-officer-sexually-assaulted-her.

[19] PRNewswire, *NYC HRA Cop Sentenced to 5 Years for Violent Sex assault But City Says It Isn't Responsible: Victim's Attorney Kelly & Rubin, LLP,* Corp Magazine (July 19, 2018), https://www.corpmagazine.com/news/2018/07/nyc-hra-cop-sentenced-to-5-years-for-violent-sex-assault-but-city-says-it-isnt-responsible-victims-attorney-kelly-rubin-llp/.

[20] *See Rivera v. City of New York, et al.*, No. 18 Civ. 9517 (S.D.N.Y.).

[21] *See Mendez v. City of New York, et al.*, Index No. 23792/2019E (Sup. Ct. Bronx Cnty.).

[22] Ashley Southall & Nikita Stewart, *They Grabbed Her Baby and Arrested Her. Now Jazmine Headley is Speaking Out.*, N.Y. Times (Dec. 16, 2018), https://www.nytimes.com/2018/12/16/nyregion/jazmine-headley-arrest.html.

pervasive at HRA offices and only getting worse.[23]

155.    It is no surprise that so many HRA clients have felt compelled to sue the City for violence they experienced at the hands of HRA security staff.  As advocates explain, "it is not unusual for . . . a client who complains at a[n HRA] center [to be] removed from the center and arrested, a completely dehumanizing and inappropriate response."[24]

156.    These lawsuits make painfully clear that the violent abuse of HRA clients is a feature, not a bug, of the HRA system.

157.    Despite ample notice of HRA peace officers' misconduct, the City has done nothing about it, instead allowing conditions to continue year after year.

158.    Ms. Headley's experience was further caused by the lack of clear protocols for whether NYPD or HRA was in charge at the scene, and which protocols governed her arrest—a lack of coordination leading to chaos that the City has long sanctioned.

159.    HRA Commissioner Steven Banks admitted this failure in the wake of Ms. Headley's experience, and "directed that HRA Peace Officers shall not request the intervention of the NYPD without first contacting the Center Director or Deputy Director or her/his designee to attempt to defuse the situation by addressing a client need."[25]

**B.    The City's Failure to Train HRA Security Staff Enables Ongoing Abuse**

160.    Despite repeated and obvious notice of HRA security staff's routine abuse of HRA clients, the City has failed to train HRA employees in a minimally adequate manner to

---

[23] *New York City Council General Welfare Committee Oversight Hearing: The Client Experience at HRA Centers*, (February 4, 2018) (testimony of Brenda Riley).

[24] *New York City Council General Welfare Committee Oversight Hearing: The Client Experience at HRA Centers*, (February 4, 2018) (testimony of the Legal Aid Society).

[25] *New York City Council General Welfare Committee Oversight Hearing: The Client Experience at HRA Centers*, (February 4, 2018) (testimony of Commissioner Steven Banks).

perform their duties.

161.   Upon information and belief, HRA employees are not trained in protocols for de-escalating violence—training which would likely have prevented Ms. Headley's arrest.

162.   HRA staff are not trained to consult or employ social workers, a step recommended by advocates and City Council members alike.[26]

163.   HRA staff are not trained to make HRA office spaces accommodating for young children, who frequently accompany their parents to appointments.

164.   HRA staff are not trained to coordinate with other agencies to minimize arrests and ensure order if arrest is truly necessary.

165.   The City must train its employees to treat HRA clients with dignity and respect rather than knee-jerk violence and baseless arrests.

**C.    The City Fails to Train NYPD Officers on Child-Sensitive Arrest Policies**

166.   It is bad enough that the City tolerates HRA security staff's practice of abusing HRA clients.  In this case, that failure was compounded by the City's failure to train NYPD officers in child-sensitive arrest practices.

167.   Due to that lack of training, the NYPD frequently arrests parents and caregivers in ways that harm and traumatize their children.  Children who are forcibly separated from their parents and caregivers after witnessing their arrest experience severe and often lifetime trauma.

---

[26] N.Y. City Council, Int. No. 1335, (N.Y. 2019), *A Local Law to amend the administrative code of the city of New York, in relation to requiring social workers at department of social services/human resources and SNAP centers*, sponsored by Council Members Ampry-Samuel and Cumbo; *see also New York City Council General Welfare Committee Oversight Hearing: The Client Experience at HRA Centers*,  (February 4, 2018) (testimony of Girls for Gender Equity) ("We strongly support ensuring that trauma informed, culturally competent social-workers are in social service agencies to provide the necessary support for New Yorkers.").

168.    It entirely foreseeable to the City that its officers will encounter children in situations where a parent or caregiver is being arrested.  At least 65% of women and 55% of men in prison have minor children.[27]  As of 2017, more than 13% of arraigned defendants in New York City were full-time caregivers of at least one child.[28]  And the percentage of women arrested has increased nationally.  Because women more frequently act as primary caregivers, this increase exacerbates the harmful impact of the City's failure to train.  All told, at least 35,581 children in the City lived with a parent who was arrested in 2017.[29]  This trauma affects a large number of children in New York City.

169.    Nevertheless, the City has failed to train NYPD officers on child-sensitive arrest policies, including: alerting NYPD officers ahead of time that children will be present at the scene of the arrest; minimizing the use of force and handcuffing; limiting what children are able to see; and affording parents or caregivers the opportunity to explain the arrest to their child, make additional phone calls as necessary, and stay with the child until another person arrives to care for them.

170.    Nor are NYPD officers trained to rely on non-ACS child advocates during and after the arrest.  NYPD officers routinely transfer children into government custody, even though a parent's or caregiver's arrest does not signify abuse or unfitness, and even though children should, wherever possible, be placed with another parent or legal guardian—ideally in their own home.

---

[27] Tanya Krupat, The Osborne Association, NY Initiative for Children of Incarcerated Parents, *The Right to Be Kept Safe and Informed": Safeguarding Children When a Parent Is Arrested* at 3 (February 2008).

[28] Aubrey Fox, New York Criminal Justice Agency, *Defendants' Full-Time Care and Financial Support of Children, 2017*, at 3 (September 18, 2018).

[29] *New York City Council General Welfare Committee Oversight Hearing: The Client Experience at HRA Centers*, (February 4, 2018) (testimony of  Bronx Clergy Criminal Justice Roundtable et al.).

171.    The City has further failed to train NYPD officers to partner and consult with organizations specializing in child development and trauma.

172.    NYPD officers do not maintain data about or document arrests made in front of children, a failure which has concealed this issue from the public eye, obscured the profound harm it inflicts, and rebuffed all efforts at accountability.

173.    In short, NYPD officers receive no training as to *any* of these protocols—many recommended by the Department of Justice and the International Association of Chiefs of Police after formal investigation and analysis.[30]  As a consequence, arresting officers do not understand the issues at stake and how best to protect children from severe trauma.

174.    Instead, NYPD officers continue to arrest parents and caregivers in an ad hoc manner that harms children and fosters mistrust between communities and law enforcement. "Instead of associating safety and comfort with a uniformed authority," said Tanya Krupat, Director of the Osborne Center for Justice Across Generations, children who witness a parent's arrest "associate fear, anger, and an abuse of power with those in uniform."[31]

175.    The NYPD—and its counterpart, the New York State Police—reportedly lag far behind all other law enforcement officers in New York when it comes to child-sensitive arrests.[32]  While all other officers are trained to safeguard children during a parent's arrest as part of the New York State Office of Public Safety's Basic Training, NYPD and New York State Police officers are not.[33]

---

[30] *See generally* International Association of Chiefs of Police and the Department of Justice's Bureau of Justice Assistance, *Safeguarding Children of Arrested Parents* (August 2014).

[31] *New York City Council General Welfare Committee Oversight Hearing: The Client Experience at HRA Centers*, (February 4, 2018) (testimony of the Osborne Center for Justice Across Generations).

[32] *New York City Council General Welfare Committee Oversight Hearing: The Client Experience at HRA Centers*, (February 4, 2018) (testimony of Bronx Clergy Criminal Justice Roundtable et al.).

[33] *Id.*

176.    The New York City Council has recognized the need for change in this area, and legislation is now under consideration that would implement certain NYPD training protocols about child-sensitive arrest practices.

177.    The City's failure to train NYPD officers directly damaged D.B. and harms other New Yorkers every day.  It is long past time for the City to train NYPD officers to protect children when a parent's arrest in their presence cannot be avoided.

## FIRST CAUSE OF ACTION
42 U.S.C. § 1983 – False Arrest
(Individual Defendants and Defendant Alston)

178.    Plaintiff repeats and realleges the above paragraphs as if they were fully set forth at length herein.

179.    By the actions described above, the Individual Defendants and Defendant Alston falsely arrested, unreasonably seized, falsely imprisoned, and detained Plaintiff and D.B. The wrongful, unjustifiable, and unlawful apprehension, arrest, seizure, and detention of Plaintiff and D.B. was carried out with any basis, without Plaintiff's or D.B.'s consent, and without reasonable suspicion or probable cause.

180.    The Individual Defendants and Defendant Alston knew they lacked probable cause to arrest/unreasonably seize Plaintiff and D.B. because they knew that Plaintiff and D.B. had not engaged in any unlawful conduct.

181.    No reasonable officer would have believed there was probable cause to arrest/unreasonably seize Plaintiff and D.B. under these circumstances.

182.    At all relevant times, the Individual Defendants and Defendant Alston acted forcibly in apprehending and arresting/unreasonably seizing Plaintiff and D.B.

183.    Throughout this period, Plaintiff and D.B. were unlawfully, wrongfully,

27

and unjustifiably held under arrest, unreasonably seized, deprived of their liberty, and falsely

charged. At all times, the unlawful, wrongful, and false arrest/unreasonable seizure of Plaintiff

and D.B. was without basis and without probable cause or reasonable suspicion.

184. The Individual Defendants and Defendant Alston deliberately undertook

these actions and their misconduct occurred without any fault or provocation on the part of

Plaintiff and D.B.

185. The Individual Defendants and Defendant Alston acted under pretense and

color of state law. The Individual Defendants and Defendant Alston acted in abuse of their

powers and beyond the scope of their authority and jurisdiction to willfully, knowingly, and

intentionally deprive Plaintiff and D.B. of their constitutional rights secured by 42 U.S.C.

§ 1983, and by the Fourth and Fourteenth Amendments to the United States Constitution.

186. The Individual Defendants' and Defendant Alston's conduct was willful,

wanton, and reckless.

187. As a direct and proximate result of the Individual Defendants' and

Defendant Alston's misconduct and abuse of authority detailed above, Plaintiff and D.B.

sustained the damages hereinbefore alleged.

**SECOND CAUSE OF ACTION**
42 U.S.C. § 1983 – Malicious Prosecution
(NYPD Defendants)

188. Plaintiff repeats and realleges the above paragraphs as if they were fully

set forth at length herein.

189. The NYPD Defendants maliciously and without justification commenced

criminal proceedings against Plaintiff.

190. The NYPD Defendants charged Plaintiff with crimes falsely, maliciously,

28

in bad faith, and without probable cause.  At no subsequent point did any NYPD Defendant

attempt to intervene and prevent the unlawful prosecution of Plaintiff.

191.    The NYPD Defendants knew they lacked probable cause to prosecute

Plaintiff because they knew she had done nothing wrong and should not have been arrested, and

that no reliable information suggested she had committed any offense.

192.    No reasonable officer would have believed there was probable cause to

prosecute Plaintiff under these circumstances.

193.    After Plaintiff spent multiple nights on Rikers Island apart from her son

and appeared to defend herself in criminal proceedings, all charges against Plaintiff were

terminated in Plaintiff's favor, and the Order of Protection against her was dissolved.

194.    The NYPD Defendants acted under pretense and color of state law.  The

NYPD Defendants acted in abuse of their powers and beyond the scope of their authority and

jurisdiction to willfully, knowingly, and intentionally deprive Plaintiff of her constitutional rights

secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments to the United

States Constitution.

195.    The NYPD Defendants' conduct was willful, wanton, and reckless.

196.    As a direct and proximate result of NYPD Defendants' misconduct and

abuse of authority detailed above, Plaintiff and D.B. sustained the damages hereinbefore alleged.

### THIRD CAUSE OF ACTION
42 U.S.C. § 1983 – Excessive Force
(Individual Defendants)

197.    Plaintiff repeats and realleges the above paragraphs as if they were set

forth fully herein.

198.    By reason of the foregoing, by grabbing, yanking, and pinning Plaintiff to

the floor, by forcibly grabbing D.B.'s limbs and body and forcibly pulling him away from

Plaintiff, and by brandishing a taser in close proximity to Plaintiff and D.B., the Individual

Defendants used unreasonable and excessive force against Plaintiff and D.B. under the

circumstances they confronted.  The Individual Defendants' brutal and unconscionable force

deprived Plaintiff and D.B. of rights, remedies, privileges, and immunities guaranteed to every

citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights

guaranteed under the Fourth and Fourteenth Amendments of the United States Constitution.

199.    The Individual Defendants acted under pretense and color of state law.

The Individual Defendants acted in abuse of their powers and beyond the scope of their authority

and jurisdiction to willfully, knowingly, and intentionally deprive Plaintiff and D.B. of their

constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth

Amendments to the United States Constitution..

200.    As a direct and proximate result of the Individual Defendants' misconduct

and abuse of authority detailed above, Plaintiff and D.B. sustained the damages hereinbefore

alleged.

### FOURTH CAUSE OF ACTION
42 U.S.C. § 1983 – Failure to Intervene
(Individual Defendants)

201.    Plaintiff repeats and realleges the above paragraphs as if they were set

forth fully herein.

202.    Uniformed NYPD and HRA officers have an affirmative duty to ensure

the lawfulness of interactions between their fellow members of service and civilians and to

intervene where they observe another uniformed employee falsely arresting a civilian or using

excessive force against a civilian.

30

203.    The Individual Defendants were present and witnessed other defendants falsely arrest/unreasonably seize and detain Plaintiff and D.B. and use excessive force against Plaintiff and D.B.

204.    The Individual Defendants had a reasonable opportunity to intervene to prevent the false arrest and detention of Plaintiff and the use of excessive force against Plaintiff and D.B.

205.    The Individual Defendants failed to take any action or make any effort to intervene, halt the unlawful actions of their fellow police officers, or protect Plaintiff and D.B.

206.    The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's and D.B.'s constitutional rights.

207.    As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff and D.B. sustained the damages hereinbefore alleged.

**FIFTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Interference with Intimate Association
(Individual Defendants and Defendant Alston)

208.    Plaintiff repeats and realleges the above paragraphs as if they were set forth fully herein.

209.    Plaintiff has a fundamental, constitutionally-protected liberty interest in the companionship, care, custody, and management of her son D.B.  Pursuant to the Fourteenth Amendment, Plaintiff is entitled to the preservation of her intimate and private familial relationship with him, free from unjustified government intrusion.  *See Roberts v. United States Jaycees*, 468 U.S. 609, 617-19 (1984); *Patel v. Searles*, 305 F.3d 130, 135-36 (2d Cir. 2002).

210.    The Supreme Court has long recognized that protecting close familial

relationships—here, a mother and a son—"from unwarranted state interference . . . safeguards the ability to define one's identity that is central to any concept of liberty." *Roberts*, 468 U.S. at 619.

211.    The right of a nuclear family to remain together without coercive government interference is among the most essential and basic aspects of the constitutionally recognized familial privacy and associational rights.

212.    The Individual Defendants' and Defendant Alston's conduct deprived Plaintiff and D.B. of their constitutional rights to familial and intimate association.  The Individual Defendants and Defendant Alston intentionally interfered with Plaintiff 's relationship with her son D.B., and D.B.'s relationship with his mother.  The NYPD and HRA's "peace officers" purposefully targeted Plaintiff's bond with D.B., literally tearing a mother away from her child without justification and then forcing them to be separated from one another for days. This already egregious conduct was made worse by the Supreme Court's temporary order of protection.

213.    The Individual Defendants' and Defendant Alston's conduct violated clearly established constitutional law.  No reasonable government official in 2018 would have believed that the Individual Defendants' and Defendant Alston's forced removal of D.B. from Plaintiff was lawful.

214.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff and D.B. sustained the damages hereinbefore alleged.

### SIXTH CAUSE OF ACTION
42 U.S.C. § 1983 – Substantive Due Process
(Individual Defendants and Defendant Alston)

215.    Plaintiff repeats and realleges the above paragraphs as if they were set

forth fully herein.

216.    At all relevant times, the Individual Defendants and Defendant Alston were acting under color of state law in their individual and official capacities within the scope of their respective employments as peace officers for the HRA and officers for the NYPD.

217.    By physically assaulting Plaintiff as she did nothing but sit on the floor of the DeKalb Job Center, exerting unnecessary and excessive force on her and her son, brandishing a taser near her and her one-year-old son, violently ripping her one-year-old son from her arms, forcibly separating her from her son for days, notifying ACS and triggering an ACS investigation into her parenting, saddling her with baseless charges, and detaining her for days on Rikers Island, the Individual Defendants and Defendant Alston engaged in outrageous and conscience-shocking conduct.

218.    The Individual Defendants and Defendant Alston acted beyond the scope of their authority and jurisdiction to willfully, knowingly, and intentionally deprive Plaintiff of her constitutional rights secured by 42 U.S.C. § 1983 including, but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments.

219.    As a direct and proximate result of the Individual Defendants' and Defendant Alston's misconduct detailed above, Plaintiff and D.B. suffered the damages hereinbefore alleged.

### SEVENTH CAUSE OF ACTION
42 U.S.C. § 1983 – *Monell* Liability
(Defendant City)

220.    Plaintiff repeat and realleges the above paragraphs as if they were set forth fully herein.

221.    At all relevant times, the City, acting through the Individual Defendants,

33

had *de facto* policies, practices, customs, and usages that directly and proximately caused the violation of Plaintiff's and D.B.'s Fourth and Fourteenth Amendment rights as alleged herein.

222.    At all relevant times, the City failed to train the HRA Defendants and thereby directly and proximately caused the violation of Plaintiff's and D.B.'s Fourth and Fourteenth Amendment rights as alleged herein.

223.    At all relevant times, the City failed to train the NYPD Defendants and thereby directly and proximately caused the violation of Plaintiff's and D.B.'s Fourth and Fourteenth Amendment rights as alleged herein.

224.    All acts complained of were carried out by HRA and/or NYPD officers in their capacities as peace officers and police officers and pursuant to the customs and practices of the City or as a result of the City's failure to train.

225.    <u>First</u>, the City maintains a widespread practice and custom of permitting, tolerating, and sanctioning violent acts of harassment and abuse by HRA security staff against HRA clients.  The actions of the Individual Defendants reflect the customs and practices of the City.  The City knew of and ignored HRA security staff's pattern and practice of abusing HRA clients, and its widespread tolerance of this abuse constituted a municipal policy, practice, or custom which caused the mistreatment of Plaintiff and D.B.

226.    The City's customs and practices that resulted in violations of Plaintiff's and D.B.'s Fourth and Fourteenth Amendment rights include but are not limited to: (1) routinely assaulting and implementing excessive force against HRA clients at HRA offices; (2) routinely falsely arresting HRA clients at HRA offices; (3); granting the HRA unbridled discretion to summon NYPD officers to arrest HRA clients without basis; (4) routinely treating HRA clients abusively and with overt disrespect; and (5) fostering a culture of fear and obstruction that

actively impedes HRA clients from seeking assistance with benefits to which they are entitled.

227.    Second, the City has failed to sufficiently train HRA peace officers such that they commit repeated and violent acts of harassment and abuse against HRA clients.  The actions of the HRA Defendants reflect the City's failure to train which led to mistreatment of Plaintiff and D.B.

228.    Third, the City failed to train NYPD officers in child-sensitive arrest policies, thereby permitting the NYPD to arrest parents while they are in front of their children in ways that inflict maximum trauma on children.  The actions of the NYPD Defendants reflect the City's failure to train, which injured D.B. and resulted in a violation of Plaintiff's and D.B.'s Fourth and Fourteenth Amendment rights.

229.    The City's failure to train NYPD officers led to the mistreatment of Plaintiff and D.B. and results in the following types of conduct, including but not limited to: (1) arresting parents in full view of their children without regard to the children's health and well-being; (2) implementing handcuffs and excessive force during the arrests of parents in full view of their children; (3) automatically placing the children of arrested parents in state custody without locating a qualified caregiver; (4) failing to consult with agencies that specialize in child development and trauma; (5) failing to train officers in child trauma and/or methods of implementing arrests to minimize harm to children; (6) failing to afford parents the opportunity to explain their arrest to children; and (7) failing to afford parents the opportunity to call family members to arrange child-care.

230.    The City, through its policymakers and agents, condoned, permitted, encouraged, and/or ratified the HRA and NYPD customs and practices challenged herein, and failed to train NYPD and HRA officers, which allowed NYPD and HRA officers to disregard

and violate Plaintiff's and D.B.'s Fourth and Fourteenth Amendment rights when Plaintiff took

her son D.B. to restore her child-care benefit at the HRA office.

231.    The City, through its policymakers and agents, was aware of, and did

nothing about, the fact that its policies, procedures, and failures to train would result in the

deprivation of the rights of individuals—including Plaintiff—who seek assistance with their

HRA benefits.  The City failed to adequately train, monitor, supervise, and/or discipline its

officers, employees, and agents, including the Individual Defendants, to respect and comply with

the Fourth and Fourteenth Amendment rights of individuals like Plaintiff and D.B.  As a result of

the City's failure, Plaintiff's and D.B.'s Fourth and Fourteenth Amendment rights were infringed

when D.B. was forcibly ripped away from his mother, and when Plaintiff was forcibly and

falsely arrested and charged with an array of sham offenses, all of which were dismissed in their

entirety.

232.    As a direct and proximate result of the City's policies, practices, and

customs, Plaintiff and D.B. sustained the damages hereinbefore alleged.

### EIGHTH CAUSE OF ACTION
Common Law False Arrest / False Imprisonment
(All Defendants)

233.    Plaintiff repeats and realleges the above paragraphs as if they were set

forth fully herein.

234.    By reason of the foregoing, and by wrongfully and illegally arresting,

detaining, and imprisoning Plaintiff and D.B., Defendants, under pretense and color of state law

and acting within the scope of their employment as NYPD officers, falsely arrested,

unreasonably seized, and falsely imprisoned Plaintiff and D.B.

235.    Defendants' wrongful, unjustifiable, and unlawful apprehension, arrest,

and detention of Plaintiff and D.B. were intentional and carried out with Plaintiff's knowledge

but without her consent.  Defendants lacked probable cause or any other basis in law to arrest,

unreasonably seize, or imprison Plaintiff and D.B.  At all relevant times, Defendants acted

forcibly in apprehending and arresting Plaintiff and D.B.

236.    Defendants acted with a knowing, willful, wanton, grossly reckless,

unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiff's and D.B.'s rights,

privileges, welfare, and well-being, and are guilty of egregious and gross misconduct toward

Plaintiff and D.B.

237.    The City, as employer of the Individual Defendants, is responsible for

their wrongdoing under the doctrine of *respondeat superior*.

238.    As a direct and proximate result of the misconduct and abuse of authority

detailed above, Plaintiff and D.B. sustained the damages hereinbefore alleged.

### NINTH CAUSE OF ACTION
Common Law Malicious Prosecution
(Defendant City and NYPD Defendants)

239.    Plaintiff repeats and realleges the above paragraphs as if they were set

forth fully herein.

240.    The NYPD Defendants, acting in their capacity as NYPD officers and

within the scope of their employment as such, maliciously commenced criminal proceedings

against Plaintiff.

241.    The NYPD Defendants charged Plaintiff falsely, in bad faith, and without

probable cause.

242.    After Plaintiff spent multiple nights on Rikers Island apart from her son

and appeared to defend herself in criminal court proceedings, all charges against Plaintiff were

37

terminated in Plaintiff's favor, and the Order of Protection against her was dissolved.

243.     The City, as employer of the NYPD Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior.*

244.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

### TENTH CAUSE OF ACTION
Common Law Assault
(Defendant City and Individual Defendants)

245.     Plaintiff repeats and realleges the above paragraphs as if they were set forth fully herein.

246.     By reason of the foregoing, the Individual Defendants, acting in their capacity as HRA peace officers and NYPD police officers and within the scope of their employment as such, intentionally placed Plaintiff and D.B. in apprehension of an imminent offensive contact and displayed the ability to effectuate such contact, and thereby committed a willful, unlawful, unwarranted, and intentional assault upon Plaintiff and D.B.

247.     The assault committed by the Individual Defendants who arrested/unreasonably seized Plaintiff and D.B. was unnecessary and unwarranted in the performance of their duties as NYPD officers and constituted an unreasonable and excessive use of force.

248.     The City, as employer of the Individual Defendants who arrested/unreasonably seized Plaintiff and D.B., is liable for their wrongdoing under the doctrine of *respondeat superior*.

249.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff and D.B. sustained the damages hereinbefore alleged.

38

## ELEVENTH CAUSE OF ACTION
Common Law Battery
(Defendant City and Individual Defendants)

250.    Plaintiff repeats and realleges the above paragraphs as if they were set forth fully herein.

251.    By reason of the foregoing and by pushing, grabbing, yanking, pinning, and restraining Plaintiff and D.B., the Individual Defendants, acting in their capacity as NYPD officers and HRA peace officers, and within the scope of their employment as such, committed a willful, unlawful, unwarranted, and intentional battery upon Plaintiff and D.B.

252.    The battery committed by the Individual Defendants was unnecessary and unwarranted in the performance of their duties as HRA peace officers and NYPD officers and constituted an unreasonable and excessive use of force.

253.    The City, as employer of the Individual Defendants, is liable for their wrongdoing under the doctrine of *respondeat superior*.

254.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff and D.B. sustained the damages hereinbefore alleged.

## TWELFTH CAUSE OF ACTION
Negligent Hiring, Retention, Training and Supervision
(Defendant City)

255.    Plaintiff repeats and realleges the foregoing paragraphs as if they were fully set forth herein.

256.    The City and its employees, servants and/or agents, acting within the scope of their employment, did negligently hire, retain, train, and/or supervise the Individual Defendants who were unfit, and whom they knew to be unfit, for the performance of police and security duties on the date of the Incident.

39

257.     The City had an obligation to ensure that NYPD and HRA officers be trained in how to arrest parents while children are present, how to coordinate with each other and other quasi-law-enforcement agencies, and how to handle disputes at HRA offices.  On information and belief, the Individual Defendants did not receive such training.

258.     On information and belief, the Individual Defendants would not have acted as they did if the City had provided adequate training and disciplined officers who falsely arrest HRA constituents, condone or fail to intervene in abuse against HRA constituents, and/or conduct the arrests of parents in ways that traumatize and harm children who are present.

259.     As a direct and proximate result of the City's negligence, Plaintiff and D.B. sustained the damages hereinbefore alleged.

*          *          *

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

a.     Compensatory damages in an amount to be determined at trial;

b.     Punitive damages against the Individual Defendants in an amount to be determined at trial;

c.     Reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

d.     Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       August 7, 2019

EMERY CELLI BRINCKERHOFF &
ABADY LLP

By:     _/s/_____
        Katherine Rosenfeld
        Emma L. Freeman
        600 Fifth Avenue, 10th Floor
        New York, New York 10020
        (212) 763-5000
        *Attorneys for Plaintiff*